UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION


DAVID L. EZELL,                          )
                                         )
         Plaintiff,                      )
                                         )
    v.                                   )          No.   1:14 CV 39 JMB
                                         )
CAROLYN W. COLVIN,                       )
Commissioner of Social Security,         )
                                         )
         Defendant.                      )

**MEMORANDUM AND ORDER**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal from an adverse ruling of the Social Security Administration.

The suit involves Applications for Disability Insurance Benefits under Title II of the Social

Security Act and Supplemental Security Income under Title XVI of the Act.  Plaintiff has filed a

Brief in Support of his Complaint, and the Commissioner has filed a Brief in Support of her

Answer.  The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. §

636(c).

I.       **Procedural History**

On July 19, 2011, Plaintiff David Lyle Ezell filed Applications for Supplemental Security

Income and Disability Insurance Benefits under Title II of the Act, 42 U.S.C. §§ 401 et. seq.  (Tr.

125-29, 130-35)[1]  Plaintiff states that his disability began on May 28, 2010,[2] as a result of neck

_____

[1]"Tr." refers to the page of the administrative record filed by the Defendant with her Answer
(Docket No. 11/filed June 4, 2014).
[2]Although Plaintiff originally alleged an onset date of May 31, 2008, he later amended his
onset date to May 28, 2010.  (Tr. 9, 125-35, 144)

and back pain, anxiety, homicidal thoughts,[3] and stiffness on the left side of his body. On initial

consideration, the Social Security Administration denied Plaintiff's claims for benefits. Plaintiff

requested a hearing before an Administrative Law Judge ("ALJ"). On May 14, 2013, a hearing

was held before an ALJ. (Tr. 23-50) Plaintiff testified and was represented by counsel. (Id.)

Vocational Expert Bob Hammond also testified at the hearing. (Tr. 43-50, 116-18) Thereafter,

on June 4, 2013, the ALJ issued a decision denying Plaintiff's claims for benefits. (Tr. 6-18) On

February 10, 2014, the Appeals Council found no basis for changing the ALJ's decision and

denied Plaintiff's request for review. (Tr. 1-4) The ALJ's determination thus stands as the final

decision of the Commissioner. 42 U.S.C. § 405(g).

## II.     Evidence Before the ALJ

### A.     Hearing on May 14, 2013

#### 1.     Plaintiff's Testimony

At the hearing on May 14, 2013, Plaintiff testified in response to questions posed

by the ALJ and counsel. (Tr. 27-43) Plaintiff last worked on March 31, 2008, the date of his

automobile accident and his initial alleged disability onset date. (Tr. 30-31) Plaintiff's parents

have supported him since that time. (Tr. 31) Plaintiff testified that he tries to help around the

house and in his father's garden by planting potatoes, picking tomatoes, and watering. (Tr. 32)

Plaintiff occasionally drives but not far. (Tr. 35) Plaintiff occasionally does the dishes and

makes a few meals, but a healthcare provider usually prepares his meals. (Tr. 32-33) Plaintiff

---

[3]Although Plaintiff alleged homicidal thoughts as a basis for his disability in his applications
for benefits, he submitted no medical evidence showing he received treatment for homicidal
thoughts. Likewise, Plaintiff did not testify at the hearing that his alleged homicidal thoughts
affect his ability to function. Plaintiff has not taken issue with the ALJ's finding of his severe
impairments, disorders of the back and affective disorders.

testified that he started receiving the services of a healthcare provider eight months after the accident. (Id.)

Plaintiff testified that turning his neck causes him pain. (Tr. 34) Dr. Andrew Gayle is his primary care doctor. (Tr. 33) Plaintiff has received numerous trigger-point injections as treatment for his neck pain with some pain relief. (Tr. 37-38) Plaintiff testified that no doctor has recommended any additional surgeries. (Tr. 38) In addition to his physical problems, Plaintiff testified that Dr. Salazar treats his mental problems. (Tr. 34) Plaintiff testified that he takes Valium and Celexa, and the medications help with his anger, but they cause him fatigue. (Tr. 36) Plaintiff indicated that he experiences crying spells and problems concentrating. (Tr. 39, 41) Plaintiff testified that he had difficulty getting comfortable, and this causes him problems sleeping at night. Plaintiff reported taking at least one to two naps a day, varying from thirty minutes to one hour to two hours in duration. (Tr. 37)

Plaintiff testified that he could not perform sedentary work because he cannot sit for a long period of time without having to lie down. (Id.) Plaintiff testified that he previously worked as a sawmill worker and a self-contracted laborer. (Tr. 43)

### 2. Testimony of Vocational Expert

Vocational Expert Mr. Bob Hammond testified at the hearing. (Tr. 45-50) The VE characterized Plaintiff's vocational background to include work experience as a tree trimmer, a sawmill worker, a truck driver, and a welder. (Tr. 45)

The ALJ asked the VE to assume someone similar to Mr. Ezell in age, education, and work experience who was limited to sedentary work, with the additional limitations that this individual would be able to only occasionally climb, stoop, balance, kneel, crouch, or crawl;

only limited to reaching in front but no overhead reaching; and would be required to avoid concentrated exposures to vibration.  (Tr. 45-46)  The VE testified that such individual could perform work as an eyewear assembler, a circuit board screener, and a semiconductor bonder, all of the jobs at the sedentary exertional level.[4]  (Tr. 47)  Next, the ALJ asked the VE to assume another individual similar to Mr. Ezell with the same limitations as the last hypothetical but with the additional limitation that the work could be performed by the worker from either the seated of the standing position.  (Tr. 47-48)  The VE opined all three jobs he previously identified would be appropriate.  (Tr. 48)

Finally, the VE opined all jobs would be eliminated if he assumed a "third individual that was only occasionally able to sustain sufficient concentration, and persistence, or pace to do even the simplest task for eight hours a day, five days a week on a regular basis."  (Id.)

In response to the question by Plaintiff's counsel, the VE classified how most of the jobs he cited are performed at a counter top with the individual alternating between standing or sitting throughout the shift.  (Tr. 49)  The VE further clarified that if the individual had to alternate between sitting and standing in excess of every thirty minutes, this would preclude the

_____

[4]Although the issue has not been raised by Plaintiff, the Court notes a possible ambiguity in the transcript of the administrative hearing.  The first hypothetical question posed to the VE assumed in relevant part an individual "limited to sedentary work with the additional limitations that this individual would be able to only occasionally climb, stoop, balance, kneel, crouch, or crawl; and only occasionally engage in overhead bilateral reaching."  Thereafter, the VE asked to clarify one of the limitations.  The record indicates that the VE had a question regarding the reaching limitations.  Rather than being limited to only occasional overhead reaching, the ALJ asked the VE to consider a person who was limited to only occasional reaching in all directions, bilaterally.  In response to this modification of the first hypothetical, the VE testified that such individual would not find work.  The ALJ then asked the VE to consider a hypothetical individual with "the same limitations as the last hypothetical – only occasional climbing, stooping, balancing, kneeling, crouching, or crawling; only occasional bilateral overhead reaching."  The VE testified that such person could perform the work all three jobs he previously identified.  (Tr. 45-48)

performance of competitive work inasmuch as that would take the individual away from persistency and pace by being off task more than six percent of the time. Counsel asked how many days the individual could miss each month before being terminated. (Id.) The VE explained the individual could not miss more than 1.5 days a month after the probationary period of ninety days and could have no absences during the ninety-day probationary period. (Tr. 50)

**B.   Forms Completed by Plaintiff**

In a Disability Report - Field Office, the DDS interviewer noted that Plaintiff walked with a cane and had to stand up a half an hour into the interview. (Tr. 154) The interviewer observed that Plaintiff "had a neck brace with him that he placed behind his head and leaned back against the wall." (Id.)

In his Disability Report - Appeal, Plaintiff did not allege any worsening or new impairments since he filed his last completed disability report. (Tr. 180)

**III.   Medical Records and Other Records**

**A.   General History**

The medical evidence in the record shows that Plaintiff has a history of back and neck pain, anxiety, stiffness in the left side of his body, and diabetes. (Tr. 210-689) Although the Court has carefully considered all of the evidence in the administrative record in determining whether the Commissioner's adverse decision is supported by substantial evidence, only the medical records relevant to the ALJ's decision and the issues raised by Plaintiff on this appeal are discussed.

To obtain disability insurance benefits, Claimant must establish that he was disabled within the meaning of the Social Security Act not later than the date his insured status expired, in

this case September 30, 2013.  <u>Pyland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) ("In order to

receive disability insurance benefits, an applicant must establish that she was disabled before the

expiration of her insured status."); <u>see</u> <u>also</u> 42 U.S.C. §§ 416(I) and 423(c); 20 C.F.R. § 404.131.


**B.      Poplar Bluff Regional Medical Center Treatment Records**

On April 1, 2008, Plaintiff presented in the emergency room at Poplar Bluff Regional

Medical Center for treatment of injuries sustained in a motor vehicle accident.  (Tr. 551)  A

computerized tomography scan showed a fracture of the right facet of C7.  (Tr. 557)  Dr. Ray

listed acute cervical strain in the clinical impression.  (Tr. 551)  Plaintiff was discharged home in

a stable and improved condition, and Dr. Ray found he could be appropriately treated on an

outpatient basis.  (<u>Id.</u>)  As treatment, Dr. Ray provided a soft collar for Plaintiff to wear.  (Tr.

552)  Dr. Ray noted that Plaintiff had moderate spasm of the paracervical musculature bilaterally

with moderate tenderness to palpation, and Plaintiff removed the collar due to discomfort.  (Tr.

553)  Although Dr. Ray explained to Plaintiff multiple times if he removed the spinal

precautions and moved around, it could kill him or paralyze him, Plaintiff still removed the

precautions and twisted his neck back and forth.  (Tr. 554)  After being fitted with the soft collar,

Plaintiff stated he felt better with the collar in place.  (Tr. 555)

**C.      Dr. Yuli Soeter - Poplar Bluff Regional Medical Center**

Between September 29, 2009, and May 18, 2011, Dr. Yuli Soeter treated Plaintiff at the

Pain Clinic at Poplar Bluff Regional Medical Center.  (Tr. 239-99, 446-549)  Plaintiff presented

at the pain clinic on September 29, 2009 on referral by Dr. Andrew Gayle.  (Tr. 297, 547)

Plaintiff reported having chronic neck pain that had been ongoing for a couple of years after a

- 6 -

motor vehicle accident.  Although Plaintiff had cervical spine surgery fourteen months earlier, he still experienced pain, and physical therapy helped "a little."  Plaintiff reported any activity caused his pain to worsen.  (Id.)  Plaintiff stated that he was unemployed, smoked a half a pack of cigarettes a day, and occasionally smoked marijuana.  (Tr. 298, 548)  Musculoskeletal examination showed tenderness to palpitation at C-4, C-5, C-6, and C-7, and motor strength of 5 out of 5 in the upper extremities.  Dr. Soeter's assessment included cervical post-laminectomy syndrome, chronic pain syndrome, cervicalgia, and upper extremity radiculopathy.  For treatment, Dr. Soeter prescribed Zonegran for Plaintiff's neuropathic pain.  (Id.)  In follow-up on October 20, 2009, Plaintiff received a trigger point injection, and he reported he experienced little pain relief and no side effects with Elavil.  (Tr. 292, 544)  On December 2, 2009, and January 6, 2010, Dr. Soeter administered trigger point injections, and Plaintiff reported Elavil had helped control his pain.  (Tr. 286-89, 532-37)  Plaintiff reported good pain relief from the trigger point injections on February 3, 2010.  (Tr. 285, 530)  Dr. Soeter refilled Plaintiff's Elavil prescription and administered a trigger point injection.  (Tr. 284-85, 529-30)  During treatment on March 3, 2010, Plaintiff reported significant and increased pain after being hit on the back of his neck by a plastic bottle while attending a ball game.  (Tr. 282, 526)  Dr. Soeter administered a trigger point injection.  (Tr. 281, 525)  On March 31 and April 29, 2010, Dr. Soeter administered trigger point injections.  (Tr. 277, 279, 519-23)  After receiving the injections, Plaintiff experienced increased range of motion and the ability to move his left arm more.  (Tr. 278, 520)

During treatment on May 27, 2010, Plaintiff stated "that he is much improved since first being treated at this clinic" and "he had been able to increase his exercise regimen and build his

muscle and strength back up in the left upper extremity." (Tr. 275, 516) Plaintiff reported that Elavil provided him pain relief and enhanced his sleep. Dr. Soeter's examination showed muscle spasms with trigger point areas and motor strength of 5 out of 5 in Plaintiff's upper extremities. Dr. Soeter administered a trigger point injection and continued his Elavil prescription. (Tr. 274-75, 515-16) On June 24, 2010, Plaintiff reported that his range of motion and his activities had increased since undergoing the trigger point injections to the point where he had been working in the garden digging, shoveling, and weeding. (Tr. 272, 512) Plaintiff was grateful for the relief he had received from Amitriptyline, and he received a trigger point injection. (Tr. 271-72, 511-12) During treatment on July 22 and August 19, 2010, Plaintiff complained of continued pain, and he received trigger point injections. (Tr. 265-69, 507-09) In follow-up on September 16, October 7, and November 4, 2010, Plaintiff received trigger point injections, and he reported being able to increase his activity after having these injections, but he still experienced significant pain. (Tr. 256-64, 496-505) Plaintiff noted that the Xylocaine Gel helped his discomfort, but he discontinued taking Keppra due to the side effects of nausea and agitation. (Tr. 260)

Plaintiff returned for trigger point injections on January 4 and March 2 and 30, 2011. (Tr. 247-55, 484-93) Plaintiff stated "it is worth going through the procedure to have relief for several weeks" but he still complained of pain. (Tr. 248) Plaintiff requested refills of Xylocaine Gel and Elavil, and he stated that both medications helped him control his pain. (Tr. 251) Plaintiff also requested trigger point injections, and he reported doing well with that treatment. (Id.) In follow-up treatment on May 18, 2011, Plaintiff reported good pain relief from the trigger point injections, and he requested another injection and medication refills. (Tr. 245, 481) Plaintiff denied having any new pain. (Id.) Dr. Soeter prescribed refills of Elavil and Xylocaine Gel and administered a

trigger point injection.  (Tr. 243, 246)

On June 15, 2011, Plaintiff complained of significant burning pain with a history of spinal enthesopathy and cervicalgia.  (Tr. 239, 478)  Plaintiff explained how his pain started after he killed a three-foot long snake with a water hose, and in the process of killing the snake, he was very physical resulting in a significant increase in pain.  (Id.)  Dr. Soeter administered a trigger point injection and continued Plaintiff's medication regimen of Elavil and Xylocaine Gel to decrease his pain and improve his function.  (Tr. 239-41)

On August 8, 2011, Plaintiff complained of burning and tingling radiation from his neck down to his shoulder.  (Tr. 384, 474)  Plaintiff attributed his pain to increased activity.  To decrease Plaintiff's pain and improve his function, Dr. Soeter administered a trigger point injection and converted his Xylocaine Jelly to Xylocaine Ointment to provide better pain relief and he also increased Plaintiff's dosage of Elavil.  (Tr. 382, 384)  In follow-up treatment on September 8, 2011, Plaintiff reported he had approximately 50% relief for two weeks, and he had increased activity so the pain had returned.  (Tr. 392, 470)  Dr. Soeter refilled the Xylocaine Ointment and administered a trigger point injection.  (Tr. 390, 392)  During treatment on October 12, 2011, Dr. Soeter noted Plaintiff has a history of cervicalgia, left upper extremity radicular pain, cervical post laminectomy syndrome, and spinal enthesopathy.  (Tr. 400, 467)  Plaintiff received refills of his medications and a trigger point injection.  (Tr. 398-400)  Although Plaintiff reported good pain relief from the trigger point injection on November 9, 2011, he complained of burning pain in his left upper arm after he fell in a barn.  (Tr. 407, 464)  An intracranial CT scan showed no problems.  Dr. Soeter provided the medication refills and administered a trigger point injection.  (Tr. 405, 407)  On December 7, 2011, Plaintiff reported that his burning pain was

significantly better, but he indicated that he still needed a trigger point injection and medication refills.  (Tr. 414, 461)  Dr. Soeter administered the injection and ordered the medication refills. (Tr. 412, 414)

Plaintiff returned on January 5, 2012, and reported continued use of Elavil and Xyloaine Jelly without any side effects or problems and requested further trigger point injections.  (Tr. 421, 457)  Dr. Soeter administered the trigger point injections.  (Tr. 419, 421)  In follow-up on February 22, 2012, Plaintiff stated he used Xlyocaine Gel for pain control and Elavil at bedtime for pain control.  (Tr. 429, 454)  Plaintiff reported that his pain increased due to his missed appointment.  Dr. Soeter administered a trigger point injection and refilled his Xylocaine Gel and Elavil prescriptions.  (Tr. 427, 429)  On March 22, 2012, Dr. Soeter administered a trigger point injection to decrease Plaintiff's pain and improve his function and provided a prescription for a functional capacity test.  (Tr. 664)  Dr. Soeter noted that he had received a letter from Plaintiff's counsel asking him to rate Plaintiff's disability and noted that he would write a prescription for a physical therapist who would have the appropriate equipment and certification to rate Plaintiff's disability.  (Id.)

On May 1, 2012, Plaintiff returned to the clinic complaining of burning pain and neck pain.  Dr. Soeter noted that Plaintiff had responded to the current medication regimen well so he prescribed Xylocaine Gel and Elavil and administered a trigger point injection.  (Tr. 447-48)  Dr. Soeter encouraged Plaintiff to continue the range of motion exercises.  (Tr. 661)  During treatment on May 22, 2012, Plaintiff requested a trigger point injection be administered and asked Dr. Soeter to rate his disability.  (Tr. 451)

### D.     Dr.  Ross Andreassen - Advanced Pain Centers

Between June 25, 2012, and March 18, 2013, Dr. Ross Andreassen treated Plaintiff's arm and neck pain. (Tr. 571-618) On June 25, 2012, Dr. Andreassen evaluated Plaintiff's cervical pain on referral by Dr. Gayle and rated that pain as moderate-to-severe. (Tr. 614, 650-55) Dr. Andreassen found Plaintiff's functional impairment to be moderate and interfered only with some daily activities such as sleeping. Plaintiff advised that applying heat relieved the pain. (Id.) Dr. Andreassen observed Plaintiff had normal gait and station, and found him able to undergo exercise testing and to participate in an exercise program. (Tr. 616) Physical examination showed tendernesss at C6 and C7; off the midline on the left in the trapezius; and over the area of the rotator cuff. Dr. Andreassen prescribed Oxycodone-Acetaminophen and ordered a refill of Feldene. (Id.) Dr. Andreassen advised Plaintiff to avoid cigarette smoking; to continue a home exercise program; to increase his activity; and to reduce his weight. Dr. Andreassen made the diagnosis of cervical discogenic pain, cervical facet arthropathy, surgical neck pain, osteoarthritis, and diabetic neuropathy. (Tr. 617-18) A CT scan of Plaintiff's cervical spine on July 9, 2012, showed postsurgical changes, including: C6-7 anterior body fusion; findings suggestive of degenerative disc disease changes at C2-3 and C3-4; and a trace of anterolisthesis of C5 on C6. (Tr. 623-24, 657) In follow-up treatment on July10, 2012, Plaintiff reported that the pain medications were helping and improving his daily functioning. (Tr.610) Examination revealed tenderness of his cervical spine. (Tr. 611) Dr. Andreassen noted that, with respect to activities of daily living, Plaintiff's physical functioning and overall functioning were improved. (Tr. 612) On August 7, 2012, Plaintiff complained of mild to moderate but sometimes severe neck pain. (Tr. 606) Dr. Andreassen continued Plaintiff's medication regimen and noted his physical functioning was better. (Tr. 608-09) In follow-up treatment on September 5, 2012, Plaintiff

reported that the effectiveness of Hydrocodone-Acetaminophen was good, and the medications were helping and improving his daily functioning.  (Tr. 602)

Plaintiff returned on October 3 and 31, 2012, for follow-up treatment for his neck pain. (Tr. 594-601)  Plaintiff reported that the pain medications were helping to improve his daily functioning, and he had no adverse reactions to the medications.  Examination showed some cervical tenderness and Dr. Andreassen continued Plaintiff's medication regimen.  (Id.)  In follow-up treatment on November 27, 2012, Dr. Andreassen added Flexeril to Plaintiff's medication regimen.  (Tr. 589-93)  On December 27, 2012, Plaintiff reported improved daily functioning and sleep, as well as tolerable pain levels with the use of pain medication.  (Tr. 584) Plaintiff received a verbal warning due to the inconsistent results in a drug urine test.  (Tr. 587) In follow-up treatment on January 22, 2013, Plaintiff complained of neck pain, that his pain medications did not provide lasting relief, and requested a trigger point injection.  (Tr. 579)  Dr. Andreassen administered a trigger point injection, increased Plaintiff's dosage of Hydrocodone-Acetaminophen, and refilled the Fledene, Flexeril, and Keppra prescriptions.  (Tr. 581-82)  On February 18, 2013, Plaintiff complained of neck pain.  (Tr. 575)  Dr. Andreassen's examination showed moderate tenderness in the center of Plaintiff's spine and around the facet joints.  (Tr. 577)  Dr. Andreassen refilled Plaintiff's medication regimen and noted his physical functioning was better.  (Tr. 577-78)  During treatment on March 18, 2013, Dr. Andreassen found moderate tenderness in the center of Plaintiff's spine and facet joints with radiation into his left shoulder and slightly reduced range of motion due to pain.  (Tr. 571-72)  Dr. Andreassen noted that Plaintiff had previous trigger point injections with good relief and scheduled Plaintiff for trigger point injections to his left arm/shoulder.  (Tr. 574)

### E.  Dr. Juan Salazar - Poplar Bluff Psychiatry Services

Between September 21, 2009, and June 15, 2011, Dr. Juan Carlos Salazar, of Poplar Bluff Psychiatry Services, treated Plaintiff's depressive disorder every two months and rated his GAF score between 55 and 64.  (Tr. 216-36)  On November 20, 2009, Plaintiff reported improvement in his pain and attributed that improvement to his treatment at a pain clinic.  (Tr. 219)  On March 23, 2010, Plaintiff reported that he was better overall and had no adverse drug reactions.  (Tr. 222)  During treatment on June 29, 2010, Plaintiff reported no drug reactions.  (Tr. 228)  In an April 26, 2011, Psychiatric Diagnostic Interview Note, Plaintiff reported having been given pain pills for his neck injury which he used occasionally.  (Tr. 234-25)  Dr. Salazar noted that Plaintiff had a significant substance abuse history due to his regular marijuana usage and methamphetamine usage.  On June 15, 2011, Plaintiff reported that he was sore from catching and physically battling a snake with a water hose.  (Tr. 231)  Plaintiff reported that he did not have any depressive symptoms or any drug reactions.  (Id.)

Between August 8, 2011, and March 5, 2012, Dr. Salazar treated Plaintiff's depressive disorder every two months and rated his GAF score between 55 and 65.  (Tr. 433-42)[5]  Plaintiff reported that he did not have any depressive symptoms and no adverse drug reactions on August

---

[5]The Global Assessment of Functioning Scale ("GAF") is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness"; it does "not include impairment in functioning due to physical (or environmental) limitations."  *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV"), 32 (4th ed. 1994).  A GAF score between 51 and 60 indicates moderate symptoms (*e.g.,* flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).  A GAF score between 61 and 70 indicates some mild symptoms (*e.g.*, depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (*e.g.*, occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.  DSM-IV 32.

8, 2011.  (Tr. 433)  During treatment on September 26, 2011, Plaintiff stated that his pain issues

were still a problem, but he was moving towards better health.  (Tr. 435)  On November 29, 2011,

Plaintiff reported that he was feeling depressed more frequently as the holiday season approached,

and he believed that Valium was still helpful.  (Tr. 437)  Dr. Salazar added Celexa to Plaintiff's

medication regimen.  (Tr. 438)  During treatment on January 5 and March 5, 2012, Plaintiff stated

that his mood was better regulated with the addition of Celexa, and he had been able to sustain a

fair level of emotional stability and anxiety control with no adverse drug reactions.  (Tr. 439, 441)


### F.      Dr. Andrew Gayle - Wayne Medical Center

Dr. Andrew Gayle, Plaintiff's primary care physician, treated him from November 11,

2009, through October 29, 2012.  A radiology examination of his right shoulder on November 11,

2009, showed diastasis of the AC joint.  (Tr. 340)

During a recheck of hyperlipidemia on May 10, 2010, Plaintiff reported that his back/joint

pain was a little better.  (Tr. 327)  During treatment for diabetes on July 9, 2010, Dr. Gayle

encouraged Plaintiff to exercise.  (Tr. 321)  In follow-up treatment on December 8, 2010, Plaintiff

presented for a recheck of anxiety, and Dr. Gayle observed Plaintiff was not anxious.  (Tr. 311-

12)  On June 23, 2011, Plaintiff presented for an evaluation of neck pain, and he reported "[t]he

onset of the neck pain has been sudden following an incident not at work (fell this am left

shoulder hit neck) and has been occurring for 2 hours."  (Tr. 301)  Dr. Gayle's examination

revealed tenderness of his posterior neck.  (Tr. 302)  Dr. Gayle prescribed a soft collar for

Plaintiff to wear over the weekend and, if his symptoms worsened, Dr. Gayle directed him to

return for treatment.  (Tr. 302)

An x-ray of his cervical spine on July 9, 2010, showed post surgical changes of his upper and lower cervical spine, degenerative changes with some mild disc space narrowing, and natural foramina.  (Tr. 344-45)  The reviewing doctor noted no change since the previous examination on January 26, 2009.  (Id.)  A cervical spine comparison on June 23, 2011, showed postoperative changes and degenerative changes.  (Tr. 339, 343)  An x-ray of his cervical spine on November 3, 2011, revealed no acute abnormality.  (Tr. 621)

On November 7, 2011, Plaintiff reported being hit in the head with a car door four days earlier and being knocked to the ground.  (Tr. 367)  Plaintiff sought treatment in the emergency room.  Plaintiff stated that he felt better, but he was still having some pain and stiffness in his neck.  (Tr. 367)

On March 28, 2012, Plaintiff returned for a recheck of his diabetes and hypertension.  (Tr. 645-49)  Dr. Gayle made the diagnosis of hyperlipdemia and directed Plaintiff to keep the scheduled follow-up treatment with an endocrinologist.  (Tr. 647)  Plaintiff returned on June 8 and July 25, 2012, for recheck appointments with Dr. Gayle.  (Tr. 636-40)  During follow-up treatment on October 29, 2012, Plaintiff admitted that he had failed to follow-up with an endocrinologist, and he has poor compliance with treatment noting he stopped taking Levimir.  (Tr. 628)  Dr. Gayle resumed Plaintiff's Levimir prescription and ordered to diet and monitor his blood sugar closely.  (Tr. 629).

### G.    Dr. Wu Wen - Southeast Endocrinology

On September 9, 2011, Plaintiff presented at Southeast Endocrinology for treatment of his diabetes by Dr. Wu Wen.  (Tr. 188)  Dr. Wen listed family history, obesity and sedentary lifestyle as Plaintiff's risk factors.  (Id.)  Dr. Wen's examination showed Plaintiff's back to be non-tender

and a normal musculoskeletal with no tenderness.  (Tr. 189)  In follow-up treatment on January

24, 2012, Plaintiff reported that he was doing well for two months with diet and regular exercise,

but he relapsed after he stopped watching his diet and failed to exercise on a regular basis.  (Tr.

185)

### H.     Joseph Toney, D.O. - Piedmont Family Clinic

On March 1, 2013, Plaintiff returned for treatment at the Piedmont Family Clinic and

admitted that he had not been taking his diabetes medications and consequently was having

problems with diabetes.  (Tr. 564)  Dr. Toney restarted Plaintiff's diabetes medications.  (Tr. 563)

In follow-up treatment on March 22, 2013, Plaintiff reported he was doing well; Dr. Toney

refilled Plaintiff's medication regimen and addressed his tobacco abuse.  (Tr. 560)

### I.     Other Record Evidence

#### 1.     *Tomography and Radiography*

An cervical spine computed tomography on June 2, 2009, revealed interval anterior

cervical discectomy and fusion at C6-C7, and degenerative changes of the cervical spine, and

postoperative changes of the posterior element fusion from C2-C3 through C3-C4 levels.  (Tr.

212-13)  An MRI of Plaintiff's cervical spine showed interval postsurgical findings of anterior

fusion C6-C7 with myelomalacia and atrophy affecting the cord at this level.  (Tr. 214-15)

A radiography of Plaintiff's cervical spine on July 6, 2010, revealed anterior cervical

fusion at C6-C7 and posterior cervical fusion at C2-C3 and C-3-C4.  (Tr. 210)  The radiologist

noted there to be no acute fracture or other abnormalities.  (Id.)

#### 2.     *Genesis Home Care*

From April 13, 2009 through March 31, 2014, Plaintiff received in-home personal care

assistant from Genesis Home Care for three hours a day from April 1, 2010 through March 31, 2014, authorized by the Missouri Division of Senior and Disability Services.  (Tr. 671-689)

## IV.    The ALJ's Decision

The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2013.  (Tr. 11)  Plaintiff has not engaged in substantial gainful activity since May 28, 2010, the amended onset date.  The ALJ found Plaintiff has the severe impairments of disorders of the back and affective disorders, but no impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.  (Tr. 11-12)  The ALJ found that Plaintiff has the residual functional capacity to perform a full range of sedentary work "except he can occasionally climb, stoop, balance, kneel, crouch, and crawl; he can occasionally reach overhead bilaterally; he must avoid concentrated exposure to vibration; and he is limited to unskilled work."  (Tr. 13)  The ALJ found Plaintiff is unable to perform any past relevant work.  (Tr. 16)  Plaintiff has at least a high school education and is able to communicate in English.  The ALJ found that, considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs existing in significant numbers in the national economy he could perform including an eyewear assembler, circuit board screener, and semi-conductor bonder.  (Tr. 17)  The ALJ concluded Plaintiff has not been disabled within the meaning of the Social Security Act at any time from May 28, 2010, the alleged onset date, through the date of the decision.  (Id.)

## V.    Discussion

To be eligible for DIB and SSI, Plaintiff must prove that he is disabled.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs.,

955 F.2d 552, 555 (8th Cir. 1992). Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B); <u>see</u> <u>also</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If he is, then he is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If he is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not have a severe impairment, he is not eligible for disability benefits. If the claimant has a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed, or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed, or is not the equivalent of a listed impairment, the ALJ proceeds to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, he is not

disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The claimant's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5.        Any corroboration by third parties of the claimant's impairments.

6.        The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

Plaintiff contends that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ failed to properly assess his credibility and RFC. Plaintiff also contends the ALJ failed to fully and fairly develop the record.

**A.      Credibility Determination and Residual Functional Capacity**

Plaintiff contends that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ failed to properly assess his credibility and RFC.

The Eighth Circuit has instructed that, in the course of making an RFC determination, the ALJ is to consider the credibility of a claimant's subjective complaints in light of the factors set forth in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). See also 20 C.F.R. §§ 404.1529, 416.929. Accordingly, the undersigned will begin with a review of the ALJ's credibility determination. See Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005) (it is clearly established that, before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility).

The factors identified in Polaski include: a claimant's daily activities; the location, duration, frequency, and intensity of his symptoms; any precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of his medication; treatment and measures other than medication he has received; and any other factors concerning his impairment-related limitations. See Polaski, 739 F.2d at 1322; 20 C.F.R. §§ 404.1529, 416.929. An ALJ is not, however, required to discuss each Polaski factor and how it relates to a claimant's credibility. See Partee v.

Astrue, 638 F.3d 869, 865 (8th Cir. 2011) (stating that "[t]he ALJ is not required to discuss methodically each Polaski consideration, so long as he acknowledged and examined those considerations before discounting a [plaintiff's] subjective complaints") (internal quotation and citation omitted); Samons v. Astrue, 497 F.3d 813, 820 (8th Cir. 2007) (stating that "we have not required the ALJ's decision to include a discussion of how every Polaski factor relates to the [plaintiff's] credibility"). Finally, this Court reviews the ALJ's credibility determination with deference and may not substitute its own judgment for that of the ALJ. See Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003) (holding that "[i]f an ALJ explicitly discredits the [plaintiff's] testimony and gives good reasons for doing so, [the reviewing court] will normally defer to the ALJ's credibility determination"); Pearsall, 274 F. 3d at 1218.

In this case, the ALJ concluded that Plaintiff's "allegations concerning the intensity, persistence and limiting effects of his symptoms are less than fully credible because those allegations are greater than expected in light of the objective evidence of record," and his "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible to the extent they are inconsistent with the [ALJ's RFC] assessment." (Tr. 14) In evaluating Plaintiff's credibility, the ALJ determined that he was not fully credible, in part, because of his routine and conservative treatment since the amended onset date, and improvement in pain and psychiatric symptoms with treatment. See Samons, 497 F.3d at 820.

The ALJ gave sufficient reasons for his adverse credibility finding and substantial evidence in the record supports the ALJ's reasoning. Although the ALJ did not specifically mention Polaski, his opinion complies with that analytical rubric in that he considered numerous Polaski factors.

Regarding back pain, the ALJ noted Plaintiff received routine and conservative treatment since the amended onset date, i.e., outpatient medication management and trigger point injections. This is a proper consideration. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001) (conservative treatment supported the ALJ's adverse credibility determination); Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (conservative treatment, including exercises and medication, and lack of surgery supported the ALJ's adverse credibility determination). Plaintiff's failure to pursue more aggressive treatment was also a proper consideration when evaluating his credibility. See Tate v. Apfel, 167 F.3d 1191, 1197 (8th Cir. 1999). The medical record showed Plaintiff had a history of cervical spine surgery in May 2008 with residual pain. In reviewing the objective test results, the physicians noted degenerative changes of Plaintiff's cervical spine and disc spaces. During the relevant time period, the undersigned notes that none of the treating physicians found surgery to be required and that conservative treatment consisting of physical therapy, pain medication, and trigger point injections provided relief for Plaintiff's complaints of back pain.

Next, the ALJ noted that the various forms of treatment have been generally successful in controlling Plaintiff's pain and mental health symptoms. See Davidson v. Astrue, 578 F.3d 838, 846 (8th Cir. 2009) ("Impairments that are controllable or amenable to treatment do not support a finding of disability."); Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (holding that if an impairment can be controlled by treatment, it cannot be considered disabling); Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997) (holding impairments which are controllable or amenable to treatment do not support a finding of disability). The ALJ considered how the medical records showed Plaintiff experienced decreased pain levels and stabilized psychiatric symptoms with the use of medications and without any significant, adverse side effects. Conditions which can be

controlled by treatment are not disabling.  See Medhaug v. Astrue, 578 F.3d 805, 813 (2009)  The

medical record showed during treatment with Dr. Andreassen, Plaintiff reported that the pain

medications were helping and improving his daily and physical functioning.[6]  The ALJ noted that,

when Plaintiff started pain management treatment on June 25, 2012, Dr. Andreassen found his

functional impairment to be moderate and interfered only with some daily activities such as

sleeping.  In follow-up treatments, Plaintiff reported that the pain medications were helping and

improving daily functioning, and Dr. Andreassen noted that, with respect to activities of daily

living, his physical functioning and overall functioning were better.  During treatment in October,

2012, Plaintiff reported tolerable pain levels with the use of pain medications; improvement in

daily functioning and sleep; and no adverse reactions to the medications and better regulated

mood with the addition of Celexa.  Furthermore, Plaintiff reported on his current medication

regimen no adverse drug reactions.

     Plaintiff's activity level further undermines his assertion of total disability.[7]  Indeed,

---

[6]Another proper consideration was Plaintiff's failure to follow his doctor's treatment
recommendations.  Although Dr. Andreassen advised Plaintiff to avoid cigarette smoking; to
continue home exercise program; to increase activity; and to reduce his weight, he failed to do
so.  See Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001) (failure to follow prescribed
course of treatment may be weighed against claimant's credibility when assessing subjective
complaints).  Similarly, the record suggests that Plaintiff's condition improved with compliance.
In follow-up treatment with Dr. Wen, Plaintiff reported that he was doing well for two months
after the initial visit with diet and regular exercise, but he relapsed after he stopped watching his
diet and failed to exercise on a regular basis.

[7]The undersigned finds Plaintiff's argument that the Missouri Division of Senior and
Disability Services' authorization for an in-home personal care assistant provided substantial
evidence that Plaintiff was unable to perform daily activities is without merit.  The undersigned
notes that no determination of disability from the Missouri Division of Senior Disability Services
or from any other agency appears in the administrative record.  The requirements for authorizing
an in-home personal care assistant are not necessarily the same for determining whether a
plaintiff is disabled for purposes of Social Security benefits.  Plaintiff does not argue that the
requirements are substantially the same.  Further, the determination of the Missouri Division of
Senior Disability Services is not binding on the Commissioner.  Cf. Pelkey v. Barnhart, 433 F.3d

Plaintiff admitted that, among other things, he engages in regular work activity by working in his father's garden digging, shoveling, and weeding, washing dishes, and preparing some meals. Also, Plaintiff reported how he killed a three-foot long snake with a water hose, and this required him to be very physical.[8]  There are cases in which a plaintiff's ability to engage in certain personal activities "does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity."  Singh v. Apfel, 222 F.3d 448, 453 (8th Cir. 2000) (finding that "staying around the house" and "watching T.V." do not constitute substantial evidence that the claimant could work); see also Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998) (a claimant's ability to engage in "personal activities such as cooking, cleaning, and hobbies" does not per se constitute substantial evidence that the claimant could work).  But that is not the case here given both the extent of Plaintiff's activities and the independent medical evidence that he was not totally disabled.  The medical record shows that numerous treating sources advised Plaintiff to increase his activity level.

Further, the Court has not found any examining physician's treatment notes stating that Plaintiff was disabled or unable to work, or imposing mental or functional limitations on his capacity for work.  See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987) (examining physician's failure to find disability a factor in discrediting subjective complaints).  The presence

575, 579 (8th Cir. 2006) (the ALJ is not bound by the disability rating or determination of another agency when he is evaluating whether the claimant is disabled for purposes of social security benefits); 20 C.F.R. §§ 404.1504, 416.904.

[8]Although this activity resulted in Plaintiff experiencing pain and receiving medical treatment, the undersigned notes that this activity required a greater exertional level than required to perform sedentary work.

or absence of functional limitations is an appropriate <u>Polaski</u> factor, and "[t]he lack of physical restrictions militates against a finding of total disability." <u>Hutton v. Apfel</u>, 175 F.3d 651, 655 (8th Cir. 1999).

The medical records are inconsistent with Plaintiff's alleged exertional limitations. For example, numerous treating sources encouraged Plaintiff to exercise, and they never imposed any restrictions on Plaintiff's activities. On May 27, 2010, Plaintiff stated "that he is much improved since first being treated at this clinic" and "he had been able to increase his exercise regimen and build his muscle and strength back up in the left upper extremity." (Tr. 275, 516) One provider noted that Plaintiff was able to undergo exercise testing and to participate in an exercise program and encouraged him to increase his activity level. Also, Dr. Andreassen made findings that Plaintiff's pain had only a moderate interference with daily activities.

Additionally, "[a]n ALJ may discount a claimant's subjective complaints if there are inconsistencies in the record as a whole." <u>Van Vickle v. Astrue</u>, 539 F.3d 825, 828 (8th Cir. 2008). <u>See</u> <u>also</u> <u>McCoy v. Astrue</u>, 648 F.3d 605, 614 (8th Cir. 2011) (inconsistencies in record detract from a claimant's credibility). As noted by the ALJ, Dr. Andreassen's June 25, 2012, treatment plan "included increased activity and weight loss." (Tr. 15) In another example, a DDS interviewer noted that Plaintiff walked with a cane, but the medical records do not support this need for a cane inasmuch as the use of a cane was never prescribed. <u>See</u> <u>Kriebaum v. Astrue</u>, 280 Fed.App'x 555, 559 (8th Cir. 2008) (finding ALJ's adverse credibility determination based on, inter alia, claimant's use of self-prescribed cane to be "supported by good reasons"). Likewise, Plaintiff testified he has to take at least one to two naps a day, varying from one hour to two hours in duration. There is no objective medical evidence substantiating Plaintiff's need to

lie down.  The record does not reflect physician imposed restrictions thus Plaintiff's restrictions in

daily activities are self-imposed rather than by medical necessity.  See, e.g., Harris v. Barnhart,

356 F.3d 926, 930 (8th Cir. 2004) (whether there is a need to lie down is a medical question

requiring medical evidence; record did not contain any evidence that medical condition required

claimant to lie down for hours each day).

In reviewing the record in this case, therefore, the Court is satisfied that the ALJ complied

with the standards outlined in Polaski and did not err in finding Plaintiff's subjective allegations

less than credible.

After engaging in a proper credibility analysis, the ALJ incorporated into Plaintiff's RFC

those impairments and restrictions found to be credible.  See McGeorge v. Barnhart, 321 F.3d

766, 769 (8th Cir. 2003) (explaining that the ALJ "properly limited his RFC determination to only

the impairments and limitations he found credible based on his evaluation of the entire record").

The ALJ determined that the medical evidence supported a finding that Plaintiff could perform

the full range of sedentary work, "except he can occasionally climb, stoop, balance, kneel, crouch,

and crawl; he can occasionally reach overhead bilaterally; and he must avoid concentrated

exposure to vibration; and he is limited to unskilled work."  (Tr. 13)  This conclusion is supported

by substantial evidence.  Although the medical evidence showed some abnormalities, Plaintiff

experienced decreased pain level with conservative treatment.  Plaintiff's doctors found his pain

to be improving and well controlled on medication.  As noted by the ALJ, no medical provider

ever suggested functional limitations more restrictive than the RFC he formulated, and the

medical records indicate his psychiatric symptoms were also stabilized by medications.  The

ALJ's RFC acknowledges that Plaintiff experienced some pain because he limited him to

sedentary work. Cf. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) (noting that a limitation to sedentary work "in itself is a significant limitation.") The ALJ also limited Plaintiff to the performance of unskilled work taking into consideration the medical record and Plaintiff's testimony. The record does not clearly mandate any greater limitations than those found by the ALJ.

An independent vocational expert testified in response to hypothetical questions that incorporated the same limitations as the RFC, and opined that such individual could perform work as an eyewear assembler, a circuit board screener, and a semiconductor bonder.

Furthermore, Plaintiff's contention that the ALJ failed to consider how his pain interfered with his ability to concentrate is without merit. First, the medical record is devoid of any reporting of this limitation to any treatment provider by Plaintiff. No treatment provider noted such a limitation. Second, as discussed above, the ALJ properly discounted Plaintiff's subjective complaints.

Therefore, the undersigned finds that the ALJ did, in fact, consider Plaintiff's pain in making his RFC determination. Although the lack of objective medical evidence supporting Plaintiff's subjective complaints may not be the sole basis for rejecting those complaints, it is a proper consideration. See Ford v. Astrue, 518 F.3d 979, 982 (8th Cir. 2008). Finally, "'[an] ALJ may disbelieve subjective complaints if there are inconsistencies in the evidence as a whole.'" McCoy v. Astrue, 648 F.3d 605, 614 (8th Cir. 2011) (quoting Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004)). The record shows such inconsistencies to support the ALJ's decision to discount his subjective complaints regarding his ability to concentrate.

The undersigned finds, therefore, that the ALJ's RFC determination is supported by

substantial evidence on the record as a whole. "It is not the role of [the reviewing] court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo." Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (citation omitted). "If after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the denial of benefits." Id. (quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996)). Accordingly, the decision of the ALJ denying Plaintiff's claims for benefits should be affirmed.

### B.      ALJ's Failure to Develop the Record

Plaintiff also contends the ALJ failed to fully and fairly develop the record. Plaintiff argues that the ALJ should have recontacted his treating physician to ask for his opinion on Plaintiff's ability to perform work-related functions. Plaintiff's argument appears to rest on a passage in the ALJ's decision in which the ALJ concluded that "there is no medical source statement from any source that suggests functional limitations more restrictive than the [RFC] found in this decision, and no medical source statement of functional limitations from any treating source." (Tr. 15) As explained below, the lack of an opinion from Plaintiff's treating source does not, in this case, necessitate a finding that the ALJ failed to properly develop the record.

"A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). "If the ALJ [does] not believe ... that the professional opinions available to him were sufficient to allow him to form an opinion, he should ... develop[] the record to determine, based on substantial evidence, the degree to which [Plaintiff's] ... impairments limited [her] ability to engage in work-related activities."

Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (citation omitted). This can be done by recontacting medical sources and by ordering additional consultative examinations, if necessary. See 20 C.F.R. § 404.1512; Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004). "The regulations do not require the Secretary or the ALJ to order a consultative evaluation of every alleged impairment. They simply grant the ALJ the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination." Matthews v. Bowen, 879 F.2d 423, 424 (8th Cir. 1989). "[I]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision." Freeman v. Apfel, 208 F.3d 687, 692 (8th Cir. 2000) (alteration in the original).

Although it is an ALJ's duty to develop the record; it is the claimant's duty to prove his RFC. See Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). Moreover, "[t]he ALJ does not 'have to seek additional clarifying statements from a treating physician unless a *crucial issue* is undeveloped.'" Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010) (quoting Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004)). "'The Commissioner's regulations explain that contacting a treating physician is necessary only if the doctor's records are inadequate ... to determine whether [the claimant] is disabled such as when the report from [the] medical source contains a conflict or ambiguity that must be resolved....'" Jones v. Astrue, 619 F.3d 963, 969 (8th Cir. 2010) (quoting Goff, 421 F.3d at 791). In this case, a crucial issue was not undeveloped; rather, it was resolved unfavorably to Plaintiff. See, e.g. Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008) (finding that claimant's failure to provide medical evidence supporting her allegations of work limitations "should not be held against the ALJ when there is medical evidence that supports the ALJ's decision"); Samons, 497 F.3d at 819 (finding the ALJ need not have contacted

claimant's treating physician after finding that physician's opinion was inadequate to establish disability when the opinion was not inherently contradictory or unreliable). "Ultimately, the claimant bears the burden of proving disability and providing medical evidence as to the existence and severity of an impairment." Kamann v. Colvin, 721 F.3d 945, 950 (8th Cir. 2013). Plaintiff failed to do so.

In the instant case, there was sufficient medical evidence, as well as Plaintiff's own testimony, for the ALJ to determine that although Plaintiff had pain, it was not disabling pain. The medical records evidenced improvement with consistent, conservative treatment. Further, neither the medical records nor the treating doctors suggested any significant functional limitations. The record provides a sufficient basis for the ALJ's decision, and he was not required to further develop the record.

## VI.    Conclusion

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Although Plaintiff articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above. An ALJ's decision is not to be disturbed "'so long as the ... decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusions had [the Court] been the initial finder of fact.'" Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)). Accordingly, the decision of the ALJ denying Plaintiff's claims for benefits should be affirmed.

**IT IS HEREBY ORDERED** that the decision of the Commissioner be **AFFIRMED**. A

separate Judgment in accordance with this Memorandum and Order is entered this same date.

Dated this __2nd__ day of September, 2015.

*/s/ John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE